# CASES

## ARGUED AND DETERMINED

IN THE

# SUPREME COURT OF NORTH DAKOTA

A. C. ANDREWS, *et al vs.* JOHN SCHMIDT, *et al.*

Opinion filed November 14, 1900.

**Action on Note—Consideration.**

> This is an action on a promissory note between the makers and payee thereof, wherein the defense of want of consideration is interposed. On a retrial of the issues of fact in this court it is found as a fact that such note is without consideration, and it is accordingly *held* that plaintiff cannot recover thereon.

Appeal from District Court, Walsh County; *Sauter, J.*

Action by A. C. Andrews and J. E. Gage against John Schmidt and Joseph Deschenes. Judgment for defendants and plaintiffs appeal.

Affirmed.

*Cochrane & Corliss,* for appellants.

*Jeff M. Myers,* for respondents.

YOUNG, J. Action on a promissory note. The trial was to the court without a jury, and resulted in a judgment in favor of defendants dismissing the action on the merits. The note in suit was given to cover an alleged shortage in the accounts of the defendant Schmidt while acting as plaintiff's agent. Deschenes signed as surety. Both defendants interposed want of consideration for the note as a defense. The case is here for trial de novo, but only as to a portion of the facts. It appears that the plaintiff is a co-partnership, and at the times herein named operated a number of grain elevators. One of these was located at the town of Cashel, in this state. Defendant Schmidt was in the employ of plaintiff from August 23, 1895, until December 25, 1897, and was in charge of the elevator at Cashel. Plaintiff also had another elevator at the city

of Drayton, the next station north of Cashel. One H. Hogg was the agent at that point. Schmidt's duties as agent embraced the purchasing and shipment of grain, and also making daily reports of business done by his elevator, including an account of moneys received and disbursed in the conduct of plaintiff's business. The actual bookkeeping was done in Minneapolis from data contained in these reports. Ordinarily, funds to buy grain were forwarded to him by express from the head office of plaintiff in Minneapolis. He had written instructions, however, to draw on plaintiff through its agent Hogg, at Drayton, in case he could not wait for a remittance from Minneapolis. There was a bank at Cashel, and there was at Drayton. On October 31, 1895, Schmidt drew on plaintiff for $1,000, and sent the draft to Hogg, at Drayton, to be cashed. The draft was received by Hogg, and, after being canceled by him, it was sent to plaintiff as a voucher for the payment of $1,000 to defendant Schmidt. The plaintiff charged Schmidt with the full amount of this draft under date of October 31, 1895. Schmidt also entered it on his daily report for that day as a charge against himself. It is conceded that on the day the draft was received Hogg transmitted to Schmidt no other or greater sum than $500. This was delivered to defendant by one Kerr, plaintiff's superintendent of elevators, with a message from Hogg that he could spare no more money that day, but would send more later. The vital controversy in the case is as to whether the remaining $500 was ever received by the defendant. It is conceded that the entire sum represented by the draft continued on the plaintiff's books as a charge against defendant, and that it entered into the balance for which the note in suit was given. The defense of want of consideration urged by both defendants hinges upon the question whether this $500 was received. If it was, the note in suit is without defense; at least so far as the defendant Schmidt is concerned. If it was not received, the amount of the error being in excess of the note, a recovery thereon cannot be had as to either defendant, for, in that event, the note was without consideration. On this point the trial court found "that the said John Schmidt never received from the said H. Hogg, agent of the plaintiffs at Drayton, as aforesaid, or from any other source, upon said $1,000 draft aforesaid, any other or further sum than the said $500 paid to him thereon as aforesaid by said Kerr as aforesaid; that said Hogg, on the day when he remitted the $500 to defendant John Schmidt, through Kerr, only had received $500 in cash from the bank, and that on the following day he received the remaining $500, and delivered it to some third party, whom he believed to be thrustworthy, to deliver to defendant Schmidt; that said third party was a passenger on the train going through Cashel, and he either failed or neglected to deliver same to Schmidt, or else he delivered it to some other person to be handed to defendant Schmidt, and such person either lost or embezzled the said sum; and that the only amount ever received by Schmidt on the $1,000

draft was the $500 delivered to him by Kerr." This finding is challenged in so far as it is determined therein that the $500 in controversy was not delivered to Schmidt. Our consideration of the evidence leads us to the same conclusion announced by the trial court in the above finding, namely, that defendant received from the $1,000 draft only the $500 delivered to him by Kerr. There is no direct evidence whatever that the other $500 ever came into his hands. It is true, Hogg testifies that on the day after he sent the $500 by Kerr he sent the remainder by some one on the train going from Drayton to Cashel. Who the person was, however, he does not remember, but states that he was a trustworthy person. It may be entirely true that the money was sent as stated, yet we are not justified in drawing as a conclusive inference therefrom that it reached the defendant; particularly in view of his denial that he received it. The actual receipt of the money by Schmidt, and not the sending it, is the important and decisive fact necessary to sustain the charge of $1,000 against the defendant, of which he complains, and establish a consideration for the note in suit. Hogg does not testify that the money was delivered; neither does he assume to know. He merely says he sent it. The messenger did not testify. He is unknown, and without name. Schmidt unhesitatingly declares that he did not receive it, and his subsequent attitude lends credence to his statement. On the day he drew the draft for $1,000 he entered it in the daily report transmitted to plaintiff. This was October 31, 1895. On the next day he wrote plaintiff as follows: "I ain't sure if cash report on report number No. 59 (which is the report containing the alleged erroneous charge) is correct. Please, if not correct, let me know." To this plaintiff replied under date of November 4th: "We will look up your cash reports, and advise you if it is wrong; that is, if we can find it readily. We would not have time to check it up from the beginning, as we are too busy. We will do that later." It seems he also called the attention of Kerr, plaintiff's superintendent, to what he thought was an error in his balances, for on December 27, 1895, he again wrote plaintiff on the subject : "Please fix up my cash account. If Mr. Kerr comes around, he can explain to you better. I credited $500 two times in my report, and Mr. Kerr saw through the mistake. I hope you will find the error, and let me know about it." Under date of January 2, 1896, plaintiff replied as follows: "We are unable to find any duplicate charge to your account of $500, but, if you can locate such a difference, we will surely correct the same;" and added that he had probably been misled into thinking there was an error because of certain entries in a previous report, which, however, did not affect his balance. It appears that he not only took the matter up with Kerr, who, as superintendent, frequently visited Cashel, and with plaintiff directly, but also with agent Hogg of Drayton. Other evidence of a similar nature shows clearly that Schmidt's statement that he did not get the $500 is not an afterthought evolved for the

purpose of defeating a recovery on the note. Plaintiff relies entirely upon defendant's alleged silence on the matter of the error to afford proof that he did in fact get the money, and also upon the fact that he permitted the error to be perpetuated for a period of more than a year and a half without correction. In support of the contention that during this time Schmidt acquiesced in the correctness of the charge, and by so doing affirmed again and again, by his silence, that the charge was entirely correct, plaintiff introduced a mass of written documents, comprising 419 daily reports and 189 letters, whose only relevancy and probative value consists in the fact that in none of them was the alleged error referred to in any way. This fact is wholly negative and circumstantial in character, and is not persuasive when considered in connection with the other evidence in the case. It merely shows that defendant did not correct the error in any of his reports, and that he did not incumber any of these particular 189 letters with reference to the alleged error. These facts do not prove anything. The daily reports, as we have seen, were merely a detailed record of each day's business. It was not possible for defendant to correct the error himself. It had gone out of his hands, and beyond his control, onto the books of the plaintiff at Minneapolis. It could be corrected only by plaintiff. As we have seen, defendant was not silent on the subject. It is true, in the course of business he wrote numerous letters, in which no reference was made to it; but it is not reasonable to conclude that, because he did not proclaim the error unceasingly, he thereby admitted he had received the money. He complained of the error to Superintendent Kerr repeatedly. He also complained to Hogg. Moreover, he wrote to plaintiff about it, from whom, and Kerr also, he received promises that it would be investigated, and corrected if it existed; and the record leaves no room for doubt that he rested secure on these assurances. This was the view of the trial court. It found "that at numerous times between the 31st day of October, 1895, and said 16th day of June, 1897, the said John Schmidt talked over and explained to the plaintiff the status of affairs existing with regard to the $1,000 draft drawn on said H. Hogg on the 31st day of October, 1895, and the plaintiff and their properly constituted and authorized agents were fully cognizant thereof, and promised and agreed to investigate the matter, and have it fixed up."

It is appellant's contention that in any event defendant is estopped from claiming that he did not get the $500. This rests entirely upon the theory that the evidence shows that defendant has acquiesced in the error, and thereby prevented plaintiff from ascertaining who got it, and so prevented a recovery of the same when a recovery was possible. This contention is disposed of by the conclusion already announced. Defendant called attention to the error of which he now complains, and repeatedly requested that it be investigated and corrected. If plaintiff suffers prejudice, it is to be directly attributed to its failure to investigate as promised.

It is established also that this particular error was talked over when the note was executed, and that the note was given conditionally upon the express understanding and agreement that the alleged error should be traced out and rectified, and, if it was found that defendant had not, in fact, received the $500 in dispute, the note was to be returned. On this there is a square conflict in the evidence. J. E. Gage, one of the members of the co-partnership of Andrews & Gage, plaintiff herein, and Superintendent Kerr, testified positively that no reference was made to the alleged error, or to any error in the account, and that the note was given unconditionally. Both of the defendants are equally emphatic in their statements to the contrary. In reaching a determination we are compelled to rely upon surrounding circumstances to ascertain where the truth lies. These lead us irresistibly to the conclusion that the note was executed as claimed by the defendants. It is entirely reasonable to believe that the defendants would execute the note under the circumstances as detailed by them, while it is entirely improbable that Schmidt, a man of very limited means, who had persistently claimed that there was an error in the balance charged against him, would give a note covering the error without even mentioning the matter. So, also, it does not appear reasonable that Deschenes, who had no personal interest in Schmidt, would obligate himself to pay a note which, on plaintiff's theory, covered an embezzlement of its funds. Both the defendants are explicit in the statement of what transpired when the note was executed, and we have no hesitation in concluding therefrom that the note was given conditionally, and that it was to be returned in case an investigation showed that defendant Schmidt did not get the $500 in question. The trial court, in weighing the evidence, had the invaluable assistance of the presence of the witnesses, of which this court is deprived. The result reached, however, are the same. The note being without consideration, it follows that plaintiff cannot recover. The judgment of the District Court is affirmed. All concur.